SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-09-0253-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2004-022846-001 |
| | ) | |
| JAHMARI ALI MANUEL, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| | ) | |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Susan M. Brnovich, Judge

**AFFIRMED**
_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
     By   Kent E. Cattani, Chief Counsel
          Criminal Appeals/Capital Litigation Section
          John Pressley Todd, Assistant Attorney General
Attorneys for State of Arizona

STEPHEN M. JOHNSON                                        Phoenix
Attorney for Jahmari Ali Manuel
_____

**B A L E S**, Justice

¶1      This automatic appeal arises from Jahmari Ali Manuel's conviction and death sentence for murdering Darrell Willeford. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031 (2011).

**FACTS AND PROCEDURAL BACKGROUND**

¶2      In March 2004, Manuel walked into a Phoenix pawn shop carrying a pistol covered with a blue plastic bag and immediately began firing at Willeford, the shop owner, who fell to the floor behind a counter.  Manuel walked around the counter and continued firing, ultimately shooting Willeford ten times.  Manuel then took two guns from the shop.  The pawn shop's surveillance camera recorded these events.  At the crime scene, police recovered the plastic bag, which contained shell casings and DNA that was later matched to Manuel's DNA profile.  In October 2004, police arrested Manuel at a North Carolina hotel.

¶3      Manuel was indicted for first degree murder, first degree burglary, armed robbery, and misconduct involving weapons.  After finding Manuel guilty on all counts, the jury found one aggravating factor, pecuniary gain, *see* A.R.S. § 13-751(F)(5) (2011), and determined that Manuel should be sentenced to death for the murder.

**DISCUSSION**

¶4      Manuel raises six issues on appeal.  For the reasons explained below, we affirm his convictions and sentences.

**A. Denial of Motion for Change of Judge**

¶5      Manuel argues that the trial court erred in denying his request for a change of judge pursuant to Arizona Rule of Criminal Procedure 10.2.  We review de novo the trial court's

2

interpretation of the rule. *See Pima Cnty. v. Pima Cnty. Law Enforcement Merit Sys. Council*, 211 Ariz. 224, 227 ¶ 13, 119 P.3d 1027, 1030 (2005).

¶6		Rule 10.2 grants the right to a peremptory change of judge. At the time of Manuel's trial, Rule 10.2(a) provided that "*[i]n any death penalty case*, any party shall be entitled to request a change of judge as a matter of right no later than ten (10) days after the state files a notice of intention to seek the death penalty." Ariz. R. Crim. P. 10.2(a) (2009) (emphasis added). In contrast, Rule 10.2(c) provided that a notice of change of judge could be filed "in a non-death penalty case" within ten days after "actual notice to the requesting party of the assignment of the case to a judge" if a notice had not earlier been filed. (Effective January 1, 2011, Rule 10.2 was amended to eliminate the distinction between capital and non-capital cases.)

¶7		Manuel was arraigned in December 2004 and the State filed its notice of intent to seek the death penalty in February 2005. In June 2009, the case was reassigned to a new judge. Within ten days of the reassignment, Manuel filed a notice of change of judge, which the trial court denied as untimely.

¶8		Manuel argues that the trial court should have granted his notice of change of judge because it did not attack the court's "dignity or integrity" and there is "no logical reason"

3

a capital defendant should have less opportunity to change a judge than a non-capital defendant. These arguments are not convincing. A peremptory change of judge in the later stages of a capital case could be more disruptive administratively because the length and complexity of capital cases make it more difficult to substitute judges. Moreover, the prior version of Rule 10.2 allowed a capital defendant two peremptory changes: one before the state filed its notice of intent to seek the death penalty and one after. *See Campbell v. Barton*, 222 Ariz. 414, 416 ¶ 11, 215 P.3d 388, 390 (App. 2009). And although Manuel cites in passing certain constitutional provisions, he has waived any constitutional argument against the rule's different treatment of capital defendants by not developing it. *See State v. Nirschel*, 155 Ariz. 206, 208, 745 P.2d 953, 955 (1987).

¶9 The trial court did not err in denying Manuel's notice of change of judge. The notice was not filed within ten days after the State filed its notice of intent to seek the death penalty and thus was untimely under Rule 10.2(a).

**B. Denial of Motion to Suppress Evidence**

¶10 Manuel argues that the trial court erred in denying his motion to suppress a pistol found in his hotel room when he was arrested. Because the police had no warrant to search the room, Manuel contends that the gun was inadmissible as the

"fruit" of an unconstitutional search. *See Nix v. Williams*, 467 U.S. 431, 441-42 (1984).

¶11     We review the denial of a motion to suppress for an abuse of discretion, considering only the evidence presented at the suppression hearing, *State v. Spears*, 184 Ariz. 277, 284, 908 P.2d 1062, 1069 (1996), and viewing the facts in the light most favorable to sustaining the ruling, *State v. Dean*, 206 Ariz. 158, 161 ¶ 9, 76 P.3d 429, 432 (2003).

¶12     Based on an informant's tip, police in North Carolina learned that Manuel was a suspect in a Phoenix murder and was staying with his girlfriend, D.J., at a Charlotte hotel.  The police also learned that Manuel had two outstanding warrants for auto theft.  A SWAT team was dispatched to the hotel, where officers forced Manuel to the floor and handcuffed him when he emerged from his second floor room.  As Manuel was being arrested, D.J. came to the room's doorway, hysterical and screaming, "don't hurt him."  She was handcuffed and taken downstairs by Detective Hetrick and Officer White.

¶13     Other officers promptly conducted a sweep of the hotel room.  While another officer covered with a rifle, Officer Balamucki lifted the mattress and box spring up from the foot of the bed to see if anyone was under it.  When Balamucki did so, he heard a "clunking" sound and could see a gun through the mesh fabric covering the bottom of the box spring.  The officers in

the room radioed Hetrick and told him they could see a gun in the box spring. Hetrick then asked D.J. if the police could search the room for "guns and drugs," and she said "go ahead." Hetrick went to the room and retrieved the pistol.

¶14 In denying Manuel's motion to suppress the pistol, the trial court found that the search of the room was lawful based both on D.J.'s consent and as incident to Manuel's arrest. At trial, the pistol was admitted into evidence and an expert witness for the State testified that ballistics tests showed the pistol had fired bullet casings found at the murder scene.

¶15 Manuel argues that the trial court erred in finding that D.J. legally consented to the search and that the search was incident to Manuel's arrest. Without reaching the consent issues, we conclude that the warrantless sweep of the room was lawful under *Maryland v. Buie*, 494 U.S. 325 (1990).

¶16 Citing *Arizona v. Gant*, 129 S. Ct. 1710 (2009), Manuel contends that a search incident to a lawful arrest is limited to the area under the arrestee's immediate control. Under *Gant*, police are authorized to search a vehicle incident to the arrest of a recent occupant "when an arrestee is within reaching distance of the vehicle or it is reasonable to believe the vehicle contains evidence of the offense of arrest." 129 S. Ct. at 1721. The Court in *Gant*, however, recognized that its holding does not affect other recognized exceptions to the

6

warrant requirement, including the exception recognized in *Buie*. *Id.; see also Meister v. State*, 933 N.E.2d 875, 878 (Ind. 2010) (concluding that *Gant* does not disturb other exceptions to warrant requirement for vehicle searches).

¶17     *Buie* recognized that police, incident to an arrest in a home, may conduct a warrantless, protective sweep: "a quick and limited search of the premises . . . conducted to protect the safety of police officers or others" and "narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  494 U.S. at 327.  The Supreme Court noted:

> [I]ncident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 334.

¶18     As we recently explained, *Buie* authorizes two types of protective sweeps: one involving the area "immediately adjacent" to the place of arrest, which does not require reasonable suspicion, and a second involving other areas, which requires a reasonable belief, supported by specific and articulable facts, that the area harbors someone who could pose a safety threat.

7

*State v. Fisher*, 226 Ariz. 563, 565-66 ¶¶ 8-9, 12-13, 250 P.3d 1192, 1194-95 (2011).

**¶19** The search of Manuel's hotel room was justified under the first *Buie* exception. The police knew that Manuel had outstanding felony warrants and was possibly involved in a Phoenix murder. While they were completing the arrest in the hallway outside the room, D.J. came to the doorway, screaming hysterically. Officers placed her in handcuffs and removed her from the scene while other officers swept the room to determine if anyone else was inside who might pose a threat. The hotel room was immediately adjacent to the place where Manuel was arrested and D.J. was detained. *Cf. United States v. Thomas*, 429 F.3d 282, 287 (D.C. Cir. 2005) (upholding sweep of bedroom adjacent to living room where arrest occurred). Thus, the police could sweep the room even without reasonable suspicion that someone was inside. *Cf. Fisher*, 226 Ariz. at 567 ¶ 15, 250 P.3d at 1196 (invalidating sweep under second *Buie* exception because not supported by reasonable suspicion that others were in an apartment).

**¶20** Because the police were authorized under *Buie* to conduct a protective sweep of the room, the question becomes whether they lawfully discovered the pistol while conducting such a sweep. *Buie* permitted the officers to look under the hotel bed because a person could have been hiding there. *See*

8

*United States v. Green*, 599 F.3d 360, 376 (4th Cir. 2010) (noting that "searching under beds is within the ambit of a protective sweep"). The police testified that, because of safety concerns, their usual practice is to look under a bed by lifting its mattress and box spring, and we conclude that their doing so here was within the permissible scope of a *Buie* sweep.

¶21 Viewed in the light most favorable to upholding the trial court's ruling, the record indicates that when Officer Balamucki lifted the bed, he saw the gun, which had slid down the box spring, through the mesh fabric on the bottom. Because he was entitled to lift up the bed and discovered the gun in plain view, the trial court did not err in denying the motion to suppress.

### C. Prosecutorial Misconduct

¶22 Manuel argues that the prosecutor engaged in misconduct at trial by making argumentative comments and asking witnesses improper questions. Prosecutorial misconduct constitutes reversible error only if (1) misconduct exists, and (2) there is a reasonable likelihood that the misconduct could have affected the jury's verdict, thereby denying the defendant a fair trial. *See State v. Gallardo*, 225 Ariz. 560, 568 ¶ 34, 242 P.3d 159, 167 (2010), *cert. denied*, 131 S. Ct. 1796 (2011). The defendant must show that the misconduct "so infected the trial with unfairness as to make the resulting conviction a

denial of due process." *State v. Morris*, 215 Ariz. 324, 335 ¶ 46, 160 P.3d 203, 214 (2007). Alleged instances of prosecutorial misconduct are evaluated both separately and for their cumulative effect. *Id.* ¶ 47.

¶23 Manuel contends that the prosecutor made argumentative comments, particularly during the State's opening statements in the sentencing phase, and ignored sustained objections. Although the prosecutor did make some argumentative comments, the record does not reflect that the prosecutor disregarded the court's rulings sustaining objections. Moreover, the trial judge repeatedly instructed the jury that it should consider only evidence presented by testimony or exhibits, that the lawyers' statements were not evidence, and that it should ignore statements to which objections were sustained.

¶24 Such cautionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements. *See State v. Bowie*, 119 Ariz. 336, 340, 580 P.2d 1190, 1194 (1978) ("Any possible prejudice from the opening statement was overcome by the court's cautionary instructions that evidence did not come from the attorneys and that the verdict must be determined only by reference to the evidence."). Jurors are presumed to follow the court's instructions. *State v. Newell*, 212 Ariz. 389, 403 ¶ 68, 132 P.3d 833, 847 (2006). In light of this presumption and the trial judge's cautionary

10

instructions, Manuel has failed to establish prejudice. *Cf.* *Gallardo*, 225 Ariz. at 568-70 ¶¶ 36-45, 242 P.2d at 167-69 (finding improper statements not prejudicial).

¶25    Manuel also argues that the prosecutor improperly cross-examined several witnesses during the penalty phase, including D.J. and Manuel. Although the prosecutor aggressively cross-examined Manuel and D.J., Manuel does not identify how any particular incident might have caused prejudice. We again presume that the jury followed the court's instructions and disregarded questions to which objections were sustained.

¶26    Citing *In re Zawada*, 208 Ariz. 232, 92 P.3d 862 (2004), and *State v. Hughes*, 193 Ariz. 72, 969 P.2d 1184 (1998), Manuel contends that the prosecutor committed misconduct by disrespecting Dr. Cunningham, Manuel's mitigation expert, and suggesting that Cunningham reached his conclusions only because he was being paid.

¶27    In *Zawada* and *Hughes*, we held that a prosecutor had committed misconduct by, among other things, suggesting, without evidence, that defense counsel had paid money to a mental health expert to fabricate a diagnosis of insanity for the defendant. *See Zawada*, 208 Ariz. at 237 ¶ 16, 92 P.3d at 867; *Hughes*, 193 Ariz. at 86 ¶ 61, 969 P.2d at 1198. These cases recognize ethical limits on a prosecutor's questioning of defense experts. "[I]t is improper [for a prosecutor] to imply unethical conduct

11

on the part of an expert witness in the absence of evidentiary support." *State v. Velazquez*, 216 Ariz. 300, 311 ¶ 48, 166 P.3d 91, 102 (2007) (quoting *Hughes*, 193 Ariz. at 86 ¶ 59, 969 P.2d at 1198).  We have also cautioned that "a prosecutor cannot attack the expert with non-evidence, using irrelevant, insulting cross-examination and baseless argument designed to mislead the jury." *State v. Roque*, 213 Ariz. 193, 229 ¶ 161, 141 P.3d 368, 404 (2006) (*quoting Zawada*, 208 Ariz. at 237 ¶ 14, 92 P.3d at 867).

**¶28**      Cunningham, a clinical psychologist, testified on direct that Manuel had experienced many "adverse developmental factors" that impair one's ability to make good decisions and that inmates with Manuel's characteristics have a relatively low risk of violent behavior in prison.  In response to defense counsel's questions, Cunningham said that he had worked about 100 hours on this case for an hourly rate of $300.  He also acknowledged that the prosecution had never called him as an expert in a capital case, noting that he would not expect the prosecution to do so given the subject matter of his testimony.

**¶29**      The prosecutor vigorously cross-examined Cunningham. Over defense counsel's objections, the prosecutor elicited that Cunningham and his wife earned about $200-300,000 annually from work on capital cases, that his total income was about $400,000, and that $650,000 was "in the ball park" for his gross income

12

from work on both capital and non-capital cases. The prosecutor's questions about Cunningham's compensation from expert work were not improper. *Cf. State v. Mauro*, 159 Ariz. 186, 199, 766 P.2d 59, 72 (1988) (acknowledging that an attorney may cross-examine an expert witness regarding payment for testimony).

¶30 During closing arguments, the prosecutor criticized Cunningham's testimony on various grounds, including by arguing that the expert had been hired 142 times by the defense and never by the prosecution because he was biased. The prosecutor asserted that Cunningham had received over $600,000 "in compensation last year doing this same thing in case after case, state to state . . . . That is bias. For $600,000 one's testimony becomes predictable." Later the prosecutor argued that Cunningham's work reflected "total extreme bias in favor of the defendant," and "a bias of $600,000."

¶31 Defense counsel did not object to the prosecutor's comments in closing argument, so we review them only for fundamental error. *See Gallardo*, 225 Ariz. at 568 ¶ 35, 242 P.2d at 167. The prosecutor's remarks were improper in certain respects. He misstated the testimony about Cunningham's annual income and his assertion that Cunningham had "done the same thing in case after case, state to state" was not supported by the record. The prosecutor's comments about Cunningham's bias

also were problematic. Counsel may attempt to impeach expert witnesses by showing that they earn their income by testifying consistently for one side. But absent evidentiary support, it is improper for a prosecutor to intimate that a defense expert has reached conclusions merely for pecuniary gain. The trial court here might have properly sustained an objection to the prosecutor's comments regarding Cunningham's compensation and bias, but no objection was made.

¶32 Manuel has not shown that the prosecutor's remarks caused prejudice sufficient to constitute fundamental error. The prosecutor here did not suggest, as did the prosecutor in *Zawada*, that the expert had colluded with the defense to fabricate a diagnosis. Moreover, the jury was instructed that the lawyer's comments were not evidence. *See State v. Velazquez*, 216 Ariz. 300, 312 ¶¶ 50, 53, 166 P.3d 91, 103 (2007) (noting jury instruction in concluding that improper comments in closing did not constitute fundamental error).

¶33 The instances of alleged misconduct identified by Manuel also do not warrant reversal when considered cumulatively. The record does not reflect pervasive misconduct that deprived him of a fair trial. *Cf. Gallardo*, 225 Ariz. at 570 ¶ 47, 242 P.3d at 169 (reaching similar conclusion regarding alleged misconduct in penalty phase opening statement and closing argument).

14

## D. Jury Question

¶34     Manuel argues that the trial judge incorrectly answered a juror's question in the penalty phase. During deliberations, a juror asked in writing if the jury could recommend the type of life sentence it might impose. The trial judge informed counsel of the question, and both sides initially agreed that the judge should answer "no." After further consideration, Manuel's counsel changed his position and maintained that the jury should be able to make such a recommendation. The trial judge responded "no" to the juror's question.

¶35     We review a trial court's rulings with respect to answering jury questions for an abuse of discretion. *State v. Kuhs*, 223 Ariz. 376, 384 ¶ 42, 224 P.3d 192, 200, *cert. denied*, 131 S. Ct. 228 (2010).

¶36     "If the trier of fact determines that a sentence of death is not appropriate . . . the court shall determine whether to impose a sentence of life or natural life." A.R.S. § 13-752(A) (2011). Because the court is assigned the responsibility of determining which type of life sentence a defendant should receive, a defendant is not entitled to a jury's recommendation on this issue. *Cf*. Ariz. R. Crim. P. 23.2(f) (providing that "at the conclusion of the penalty hearing, the jury shall render a verdict determining whether to impose a sentence of death").

15

The trial court therefore did not abuse its discretion in responding "no" to the juror's question.

### E. Juror Misconduct

¶37    Manuel argues that a juror was intoxicated during at least one day of testimony and that the trial court abused its discretion in denying Manuel's motion for a new trial based on this misconduct.

¶38    During the penalty phase, the jury recessed for lunch on September 3, the last trial day before Labor Day weekend. When the trial resumed after lunch, a juror gave the bailiff a note saying he thought Juror 9 was drunk.  After about twenty minutes of testimony, the judge excused the jury and questioned Juror 9 and an alternate juror about their activities over lunch.  Juror 9 said that he had drunk a glass of bourbon; the alternate juror admitted drinking a shot of whiskey.  The judge admonished the entire jury not to consume alcoholic beverages during juror hours and recessed the trial for the weekend. Denying Manuel's motion for a new trial, the judge ruled that, when the trial resumed, defense counsel could repeat the testimony given by a defense witness after lunch.  When the trial resumed after Labor Day, the witness continued his testimony and defense counsel repeated some matters covered the preceding week.  The alternate juror who acknowledged drinking at lunch did not participate in the jury's deliberations.

16

¶39     After the jury returned its penalty-phase verdict, Manuel renewed his motion for a new trial. At an evidentiary hearing, Juror 9 testified that it was not uncommon for him to have a beer over lunch, but he did not believe his consumption of alcohol interfered with his ability to be a fair and impartial juror, and he had not consumed any alcohol during juror hours after the judge's admonishment. The trial court denied the renewed motion for a new trial.

¶40     We review a trial court's decision to grant or deny a new trial based on alleged juror misconduct for an abuse of discretion. *State v. Jones*, 185 Ariz. 471, 484, 917 P.2d 200, 213 (1996). "[J]uror misconduct warrants a new trial [only] if the defense shows actual prejudice or if prejudice may be fairly presumed from the facts." *State v. Cruz*, 218 Ariz. 149, 163 ¶ 68, 181 P.3d 196, 210 (2008) (quoting *State v. Miller*, 178 Ariz. 555, 558, 875 P.2d 788, 791 (1994)) (alterations in original).

¶41     Despite Manuel's assertions, the record does not indicate that Juror 9 was intoxicated during trial except possibly after lunch on September 3. On that occasion, the judge appropriately responded by recessing the trial for the weekend, admonishing the jury against consuming alcohol, and permitting Manuel's counsel to repeat any testimony that was given in the twenty minutes after lunch. Under *Jones*, Manuel must show that "the misconduct was prejudicial or that prejudice

17

can be fairly presumed" to secure reversal of the trial court's denial of a new trial. 185 Ariz. at 484, 917 P.2d at 213. Although we do not condone Juror 9's drinking, we decline to adopt a per se rule mandating an immediate mistrial whenever a juror has consumed alcohol during a capital trial. *Cf. United States v. Taliaferro*, 558 F.2d 724, 726 (4th Cir. 1977) (holding, in non-capital case, the juror's consuming alcohol does not require new trial absent prejudice); *State v. Dann*, 220 Ariz. 351, 363 ¶ 50, 207 P.3d 604, 616 (2009) (noting, in capital case, that declaration of mistrial is most dramatic remedy for trial error and should only be granted if justice will be thwarted absent a new trial). The judge did not abuse her discretion in denying Manuel's motion for new trial.

## F. Review of the Death Sentence

¶42 Because the murder occurred after August 1, 2002, this Court must review Manuel's death sentence to "determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." A.R.S. § 13-756(A) (2011). A finding of an aggravating circumstance is not an abuse of discretion if there is "any reasonable evidence in the record to sustain it." *Morris*, 215 Ariz. at 341 ¶ 77, 160 P.3d at 220. The jury's determination that death is the appropriate sentence will not be reversed "so long as any reasonable jury could have concluded that the mitigation

18

established by the defendant was not sufficiently substantial to call for leniency." *Id.* ¶ 81.

### 1. Aggravating Circumstances

¶**38** The jury found that the murder was committed as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value, *see* A.R.S. § 13-751(F)(5). The trial court properly instructed the jury that the State had to prove that pecuniary gain was a motive, cause, or impetus for the murder and not merely the result of the murder. *See State v. Sansing*, 200 Ariz. 347, 353 ¶ 12, 26 P.3d 1118, 1124 (2001), *vacated and remanded on other grounds*, 536 U.S. 954 (2002).

¶**39** Sufficient evidence exists to support the jury's finding. Before the murder, Manuel had asked D.J. to go into the pawn shop and attempt to pawn a chain he had given her. D.J. testified that Manuel was "broke" and might have needed money for gas. The jury also could infer that he had sent D.J. inside to determine who was present. Manuel entered the shop firing his weapon, suggesting that he committed the murder to facilitate the robbery. Manuel then took two pistols from the pawn shop. The jury could reasonably conclude that pecuniary gain was a motive, cause, or impetus for the murder.

### 2. Mitigating Circumstances

¶**40** After the jury finds one or more aggravating factors, each juror must determine whether death is the appropriate

penalty. *See* A.R.S. § 13-751(C); *see also Gallardo*, 225 Ariz. at 570 ¶ 51, 242 P.3d at 169. We will uphold a jury's decision that death is appropriate if any "reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency." *Id.* ¶ 52.

¶41      Manuel presented evidence about his troubled childhood and family history, his behavior during past incarcerations, and how his execution would impact his extended family. Although this evidence was extensive, a reasonable juror could conclude that the mitigation was not sufficiently substantial to call for leniency. Manuel was thirty-two years old at the time of the crime, he had been incarcerated several times previously, and he did not establish a strong causal relationship between the mitigating circumstances and the murder. The jury did not abuse its discretion by determining that Manuel should be sentenced to death. *Cf. Cruz*, 218 Ariz. at 170-71 ¶ 138, 181 P.3d at 217-18 (concluding death sentence was not abuse of discretion when jury found one aggravating factor and defendant offered little or no evidence connecting mitigating evidence with the crime).

### G. Issues Preserved for Federal Review

¶42      To avoid preclusion, Manuel raises twenty-two additional constitutional claims that he states have been rejected in previous decisions by this Court or the United

20

States Supreme Court. The attached appendix lists these claims and the decisions Manuel identifies as rejecting them.

## CONCLUSION

**¶43**     We affirm Manuel's convictions and sentences.


_____
                              W. Scott Bales, Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Andrew D. Hurwitz, Vice Chief Justice


_____
A. John Pelander, Justice


_____
Robert M. Brutinel, Justice

**APPENDIX**

Manuel raises twenty-two issues to preserve them for federal review. This Appendix lists his claims and the decisions he identifies as rejecting them.

1. The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Harrod*, 200 Ariz. 309, 320, 26 P.3d 492, 503 (2001).

2. The death penalty is imposed arbitrarily and irrationally in Arizona in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution, as well as Manuel's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, § 4 of the Arizona Constitution. *State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988).

3. Application of the death penalty on the facts of this case would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 1, 4, and 15 of the Arizona Constitution.

4. The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 1, 4, and 15 of the Arizona Constitution. *State v. Sansing*, 200 Ariz. 347, 361, 26 P.3d 1118, 1132 (2001).

5. Aggravating factors under A.R.S. § 13-703(F) are elements of capital murder and must be alleged in an indictment and screened for probable cause. Arizona's failure to require this violates a defendant's right to due process and a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Art. 2, §§ 4 and 24 of the Arizona Constitution. *McKaney v. Foreman*, 209 Ariz. 268, 100 P.3d 18 (2004). Recently, although not mandating aggravators to be screened for probable cause on constitutional grounds, this Court found that defendants had a right under the rules of criminal procedure to have the aggravators screened for probable cause. *See Chronis v. Steinle*, 220 Ariz. 559, 208 P.3d 210 (2009).

22

6.  The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution.  *Harrod*, 200 Ariz. at 320, 26 P.3d at 503. Proportionality review serves to identify which cases are "above the norm" of first-degree murder thus narrowing the class of defendants who are eligible for the death penalty.

7.  Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. Failure to require this proof violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution.  *State v. Ring*, 200 Ariz. 267, 284, 25 P.3d 1139, 1156 (2001) (*Ring I*), *rev'd on other grounds by Ring II*.

8.  A.R.S. § 13-703 provides no objective standards to guide the sentencer in weighing the aggravating and mitigating circumstances and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 2, § 15 of the Arizona Constitution.  *State v. Pandeli*, 200 Ariz. 365, 382, 26 P.3d 1136, 1153 (2001).

9.  Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4 and 15 of the Arizona Constitution.  *State v. Poyson*, 198 Ariz. 70, 83, 7 P.3d 79, 92 (2000).

10. A.R.S. § 13-703 does not sufficiently channel the sentencer's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *Pandeli*, 200 Ariz. at 382, 26 P.3d at 1153.

11. Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the

23

Arizona Constitution. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1994).

12. Arizona's current protocols and procedures for execution by lethal injection constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *State v. Andriano*, 215 Ariz. 497, 510, 161 P.3d 540, 553 (2007).

13. Arizona's death penalty unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

14. A.R.S. § 13-703, (now 13-751 et. seq.) unconstitutionally fails to require the cumulative consideration of multiple mitigating factors or require that the jury make specific findings as to each mitigating factor. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995).

15. Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

16. Death sentences in Arizona have been applied arbitrarily and irrationally and in a discriminatory manner against impoverished males whose victims have been Caucasian. *State v. West*, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993).

17. Subjecting Appellant to a second trial on the issue of aggravation and punishment before a new jury violates the double jeopardy clause of the Fifth Amendment. *State v Ring*, 204 Ariz. 534, 550, 65 P.3d 915, 931 (2003) (*Ring III*).

18. The reasonable doubt jury instruction at the aggravation trial lowered the state's burden of proof and deprived Appellant of his right to a jury trial and due process under the Sixth and Fourteenth Amendments. *State v. Dann*, 205 Ariz. 557, 575-76, 74 P.3d 231, 249-50 (2003) (*Dann I*).

19. Arizona's death statute creates an unconstitutional presumption of death and places an unconstitutional burden on Appellant to prove mitigation is "sufficiently substantial to

24

call for leniency." State v. Glassel, 211 Ariz. 33, 52, 116 P.3d 1193, 1212 (2005).

20. The introduction of victim impact evidence is improper because a defendant does not receive pretrial notice or an opportunity to confront and cross-examine the victim witness. *Lynn v. Reinstein*, 205 Ariz. 186, 191, 68 P.3d 412, 417 (2003).

21. The trial court improperly omitted penalty phase instructions that the jury could consider mercy or sympathy in evaluating the mitigation evidence and determining whether to sentence the defendant to death. *State v. Carreon*, 210 Ariz. 54, 70-71, 107 P.3d 900, 916-917 (2005).

22. The jury instruction requiring the jury to unanimously determine that the mitigating circumstances were "sufficiently substantial to call for leniency" violated the Eighth Amendment. *State v. Ellison*, 213 Ariz. 116, 139, 140 P.3d 899, 922 (2006).